Merrimack, }
Dec. 29, 1901. }

AMERICAN LOAN & TRUST CO. *&* *a.* v. GENERAL ELECTRIC
CO. *&* *a.*

An electric light and power company, organized under the general law and making use of public highways under licenses granted by town and city officers, may mortgage its property and secondary franchises as security for its indebtedness, without the special assent of the legislature.

BILL IN EQUITY, to restrain the General Electric Company, a judgment creditor of the Concord Electric Company, from completing a levy on property of the latter company, mortgaged to the American Loan and Trust Company. Facts agreed.

The Concord Electric Company is a corporation, formed May 29, 1901, under the general law. Its articles of association state the objects of its formation as follows: " The objects for which this corporation is established are (1) to acquire from the purchasers. of all the property, rights, and franchises of Concord Land and Water Power Company under foreclosure sale held at Concord,.

New Hampshire, on March 6, 1901, all said property, rights, and franchises acquired by said purchasers at said sale; (2) as the successors and assigns of said purchasers, to be constituted under chapter 52 of the Laws of 1895 a corporation as of the date of said sale for all purposes, and to be vested with all the rights, powers, and privileges of said Concord Land and Water Power Company under its charter or the public laws; (3) to acquire, improve, and develop water-power on the Merrimack river in the city of Concord for hydraulic, electrical, and other purposes; (4) to generate, distribute, and deal in electric energy in all its forms; (5) to buy, own, sell, and deal in real estate and personal property in connection with the foregoing business; (6) to acquire, own, and dispose of stocks and bonds in other corporations in connection with the various forms of business herein specified; and (7) to carry on such manufactures and enterprises in connection with all the foregoing purposes as may from time to time appear necessary or desirable to the corporation."

The Concord Land and Water Power Company, to whose property, etc., the Concord Electric Company succeeded, was also a corporation, formed in 1892 under the general law, for the following purposes, as specified in its articles of association: "The object for which the corporation is established is the improvement and development of the water-power on the Merrimack river, in the city of Concord, for electrical and other purposes, and buying, owning, and selling such real and personal property, and carrying on such various manufactures and such other business in connection with said water-power and power developed therefrom as may seem necessary and desirable to the corporation."

The latter corporation owned, among other things, an electric light and power plant in Concord, operated by electricity developed on the company's property at Sewall's Falls on the Merrimack river, and conducted along highways and streets in the city upon lines of wire placed therein under licenses granted by the mayor and aldermen. October 2, 1893, the Water Power Company mortgaged its property, rights, and franchises to the American Loan and Trust Company to secure the payment of an issue of bonds amounting to $400,000. The property of the company was in the possession and under the management of receivers, duly appointed by the court, from June, 1897, to July, 1901, and they made large additions to it under the authority of the court. By virtue of a decree made in October, 1900, in a suit in favor of the Trust Company for a foreclosure of the mortgage, the property, rights, and franchises of the Water Power Company, including the additions and improvements made by the receivers, were sold and conveyed, July 1, 1901, to three persons, who immediately conveyed the same to the Concord Electric Company.

The Concord Electric Company, in addition to its organization under the general law, availed itself of the authority conferred by chapter 52, Laws 1895, to become a corporation, by adopting the present name, fixing the capital stock at $400,000, and filing with the secretary of state the certificate required by that chapter.

The Concord Electric Company issued bonds for the purpose of paying a part of the purchase price of the property, etc., and for the purpose of paying certificates issued by the receivers amounting to $70,000, for the cost of additions and improvements, the payment of which was assumed by the company in the purchase, and for the purpose of providing funds for making further additions, improvements, and extensions; and the payment of the bonds was secured by a mortgage duly executed and recorded, to the American Loan and Trust Company, of all the property, rights, privileges, and franchises acquired by the purchase, and to be subsequently acquired, and all contracts, choses in action then and subsequently belonging to the company, and all income and revenues accruing from the mortgaged premises. The bonds are now in the hands of holders for value. The property so acquired and mortgaged consisted of several hundred acres of land, situated on both sides of the Merrimack river in Concord, upon which are located a dam, canal, and power-house used for converting the power of the river into electric energy; a pole line for transmitting the energy from the power-house to the compact part of the city; a station on Bridge street in Concord containing apparatus for distributing electric currents, and an auxiliary electric plant operated by steam power for supplying electric energy when the water-power plant is disabled; lines of wire, located in streets of the city under licenses granted by the mayor and aldermen, for supplying electric energy for lights for the city and its inhabitants, and for mechanical uses; tools and other personal property used in the business; and contracts for supplying electric energy to customers, including contracts with the city for lighting streets. The business carried on by the company is identical with that carried on by its predecessor; and the property covered by the mortgage, excepting the additions that were made by the receivers, is substantially the same as that covered by the Water Power Company's mortgage aforesaid. A large portion of the company's real estate is now used for agricultural purposes by tenants. The company has a large quantity of land for sale for mechanical and building purposes, and is prepared to furnish electric energy for manufacturing purposes on this land.

The General Electric Company, having recovered a judgment against the Concord Electric Company, has commenced a levy upon the Bridge-street station above mentioned. This station and

the apparatus contained in it are indispensable to the carrying on of the Concord Company's business. The defendants contest the validity of the Trust Company mortgage on the ground that the Concord Company had no power to make such a conveyance of its property without special authority from the legislature. The question of power was transferred from the October term, 1901, of the superior court by *Stone*, J.

*Streeter & Hollis*, for the plaintiffs.

*Johnson, Clapp & Underwood* (of Massachusetts), for the defendants. The defendants make no attack upon the validity of the mortgage based upon any alleged defects or omissions in respect of action or votes by the stockholders or directors of the mortgagor company, nor is it claimed that the bonds themselves are invalid as obligations or promises to pay; but the defendants do insist that the mortgage is void for want of authority on the part of the Concord Electric Company as a corporation to make it, the legislature never having given it express permission to mortgage any of its property, rights, or franchises, and the corporation itself being of such a public character that due performance of its obligations to the public is inconsistent with a voluntary disposition of its property, whether by way of a sale, mortgage, or other conveyance.

The Concord Electric Company is a public corporation within the meaning of the old and well-established rule, that although a corporation may, as a general proposition, alienate its property with the same freedom as an individual, "a corporation charged with duties to the public, and which has received its franchises and privileges from the state in consideration of the assumption and performance of such duties, cannot sell or dispose of its franchises or of the property which is essential to the performance of such duties without authority from the state." Elliott Corp., s. 187. This rule also restricts the power to mortgage such property, as the execution of a valid mortgage necessarily contemplates a possible if not a present change of title. Tay. Corp., s. 125 ; 4 Thomp. Corp., s. 5355. The rule has often been applied to steam railroad companies. *Richards* v. *Railroad*, 44 N. H. 127, 136 ; *Commonwealth* v. *Smith*, 10 Allen 448 ; *Black* v. *Canal Co.*, 22 N. J. Eq. 130, 399 ; *Thomas* v. *Railroad*, 101 U. S. 71 ; *Branch* v. *Jesup*, 106 U. S. 468. Although the soundness of the doctrine is questioned by the supreme court of Maine in *Shepley* v. *Railway*, 55 Me. 395, 407, and *Kennebec & Portland R. R.* v. *Railroad*, 59 Me. 9, 23, and by the Michigan court in *Detroit* v. *Company*, 43 Mich. 594, it has been generally adopted in this country, and

has been applied also to street railway and gas companies. *Brunswick Gas Light Co.* v. *Company*, 85 Me. 532; *Richardson* v. *Sibley*, 11 Allen 65; *Gibbs* v. *Company*, 130 U. S. 396.

What are the reasons for the rule, and are they not as applicable to electric light companies, gas companies, and the like, as to railroad companies? In *Commonwealth* v. *Smith, supra,* the court said: "In the case of a railroad company created for the express and sole purpose of constructing, owning, and managing a railroad, . . . having public duties the discharge of which is the leading object of its creation, . . . there are certainly great and, in our opinion, insuperable objections to the doctrine that its franchise can be alienated, and its powers and privileges conferred by its own act upon another person or body, without authority other than that derived from its own incorporation. . . . The power to mortgage can only be coextensive with the power to alienate absolutely, because every mortgage may become an absolute conveyance by foreclosure. And although the franchise to exist as a corporation is distinguishable from the franchises to be enjoyed and used by the corporation after its creation, yet the transfer of the latter differs essentially from the mere alienation of ordinary corporate property." In *Thomas* v. *Railroad*, 101 U. S. 71, 83, the rule is stated in the following language: "The principle is that where a corporation, like a railroad company, has granted to it by charter a franchise intended in large measure to be exercised for the public good, the due performance of those functions being the consideration of the public grant, any contract which disables the corporation from performing those functions, and which undertakes, without the consent of the state, to transfer to others the rights and powers conferred by the charter and to relieve the grantees of the burden which it imposes, is a violation of the contract with the state, and is void as against public policy." The rule being founded upon the fact of privileges conferred in return for a public duty exacted, no good reason can be adduced for not applying it to electric light companies and other public service corporations as well as railroads. In New Hampshire the legislature has, by express enactment, placed electric light companies in the category of public service corporations and placed upon them particular burdens. P. S., *c.* 81, *s.* 13. The same chapter authorizes the maintenance of poles and wires in the public streets and highways, and provides for the ascertainment and payment of damages suffered by abutters. The provision is for the exercise in a limited way of the right of eminent domain. The effect of this legislation is, we submit, to invest such companies with all the consequences that flow from the fact of a company being a public corporation.

It may be argued that the Concord Electric Company is under no obligation to continue in business; that it may at any time vote to liquidate, and thereafter sell and dispose of its property; and that therefore the general rule restricting the right of alienation by way of mortgage or otherwise should not be applied to this corporation. But the premises of the argument beg the question. It is submitted that the company is as much bound to the state to continue its business of supplying the public with light as is any railroad company to continue to furnish facilities of transportation. In *Gibbs* v. *Company, supra,* 408, 411, the court say: "The supplying of illuminating gas is a business of a public nature to meet a public necessity. It is not a business like that of an ordinary corporation engaged in the manufacture of articles that may be furnished by individual effort. . . . These gas companies entered the streets of Baltimore, under their charters, in the exercise of the equivalent of the power of eminent domain, and are to be held as having assumed an obligation to fulfill the public purposes to subserve which they were incorporated." In *Brunswick Gas Light Co.* v. *Company,* 85 Me. 532, 537, where it is held that one gas company could not lease or sell its property and franchises to another, the court said: "One reason why these corporations are not allowed to sell or lease their corporate powers and franchises without legislative authority is that if they were allowed to do so they might thereby disable themselves from the performance of their public duties, and thus escape from the power of the courts and of the legislature to enforce their performance." The case of *Evans* v. *Heating Co.,* 157 Mass. 37, expressly decides that a corporation organized to supply heat by steam through pipes laid in the public streets has power to make a mortgage; but such a corporation has never been put under any public duties in relation to furnishing heat. The case contains a *dictum* that a gas company may without legislative authority make a valid mortgage, but it is *dictum* merely. The court admitted the general doctrine that public corporations cannot mortgage their property, but felt that the particular statutes of the commonwealth had regarded gas and heating companies as private, rather than as public or *quasi*-public, corporations.

It is a universal rule that in the construction of charters all doubtful points must be settled against the grantees and in favor of the public. Section 7, chapter 148, of the Public Statutes, referring to the general powers of corporations, provides that "they may make contracts necessary and proper for the transaction of their authorized business, and no other." Though the power to borrow money and mortgage property might be implied in favor of an ordinary business or manufacturing corporation,

yet no such implied power can be allowed in case of corporations which exercise public functions, in view of the generally recognized principle that corporations of such a character do not possess the ordinary rights of sale, lease, or mortgage, unless conferred by express authority of the legislature.

CHASE, J.   The power of private corporations generally to secure the payment of their debts by a mortgage of their property is not denied ; but it is alleged that the Concord Electric Company is a *quasi*-public corporation and, being such, cannot mortgage or otherwise alienate its franchises and the property required for the performance of its public duties without the assent of the legislature.   According to the weight of authority, measured by the number of the cases, *quasi*-public corporations have this disability. 4 Thomp. Corp., *ss.* 5352, 5355, and authorities cited.   Whether the reasons upon which the doctrine rests are sufficient to support it has been seriously questioned.   3 Cook Corp. 1782, a ; *Miller* v. *Railroad*, 36 Vt. 452; *Shepley* v. *Railway*, 55 Me. 395, 407 ; *Kennebec & Portland R. R.* v. *Railroad*, 59 Me. 9 ; *Hunt* v. *Gaslight Co.*, 95 Tenn. 136.   The doctrine has been approved in this state in respect to railroad corporations.   *Pierce* v. *Emery*, 32 N. H. 484, 504 ; *Richards* v. *Railroad*, 44 N. H. 127 ; *State* v. *Hayes*, 61 N. H. 264, 324.

Whether the secondary franchises of a *quasi*-public corporation — the franchises other than that of being a corporation — and the property required for the fulfilment of the public purposes of the corporation may be mortgaged, depends upon the terms upon which the franchises are granted, " or, in the absence of anything special in the grant itself, upon the intention of the legislature, to be deduced from the general purposes it had in view, the means it intended to have employed to execute those purposes, and the course of legislation on the same or similar subjects ; or, as it is sometimes compendiously expressed, upon the public policy of the state.   *Hall* v. *Railroad*, 11 Fed. Cas., No. 5948.

The Concord Electric Company was formed under the general law of the state.   This provides that any five or more persons of lawful age may associate together by articles of agreement to form a corporation for certain specified purposes, and for " the carrying on of any lawful business except banking, life insurance, the making of contracts for the payment of money at a fixed date or upon the happening of some contingency, and the construction and maintenance of railroads."   P. S., *c.* 147, *s.* 1.   When the articles are recorded as required, and the charter fee, if any, is paid, the signers become a corporation, " and such corporation, its officers and stockholders, shall have all the rights and powers and be sub-

ject to all the duties and liabilities of other similar corporations, their officers and stockholders, except so far as the same are limited or enlarged by this chapter." *Ib.*, s. 4. Among the powers expressly granted to such corporations is the power to make " contracts necessary and proper for the transaction of their authorized business," and to " purchase, hold, and convey real and personal estate necessary and proper" for such purpose, not exceeding the amount authorized by their charter or by statute. P. S., *c.* 148, *ss.* 7, 8.

One reason that has been assigned for the non-vendibility of a *quasi*-public corporation's franchises and property, without the special assent of the legislature, is that the state, in granting the corporate powers, relies more or less upon the ability and character of the persons to whom the grant was made for accomplishing the public purposes in view. If this is a sound reason in any case (*Shepley* v. *Railroad*, 55 Me. 395, 407 ; *Miller* v. *Railroad*, 36 Vt. 452, 492 ; 4 Thomp. Corp., s. 5352), it certainly is not in the case of a corporation formed under the general law of this state. The state has no part in determining who the members of the corporation shall be, other than that they shall be of lawful age. Any five persons of lawful age may become a corporation by force of their own acts in making the agreement, causing it to be recorded, and paying the required charter fee. After the corporation is organized and its capital stock is paid in, the stockholders are liable to constant change by transfers of stock in various ways. The grant of corporate powers under these circumstances is not in any sense a personal trust. *Threadgill* v. *Pumphrey*, 37 Tex. 573, 578.

The only special privilege which the Concord Electric Company acquired by its incorporation was the right to be a corporation. The power of eminent domain was not delegated to it, it was not exempted from taxation, nor was it granted a monopoly of furnishing electric lights to the city and its inhabitants. It was granted no other or greater power in respect to its proposed business than a natural person would have in the prosecution of the same business. It acquired the right to construct lines of wire in highways of the city, not by virtue of its incorporation, but by virtue of licenses granted by the mayor and aldermen. The statute provides that " telegraph, telephone, electric light and electric power poles and structures may be erected and maintained in any public highway, and the necessary wires may be strung on such poles or placed beneath the surface of such highway by any person or corporation as provided in this chapter, and not otherwise." P. S., *c.* 81, *s.* 1. It further provides that the selectmen (or, in case of a city, the mayor and aldermen; P. S., *c.* 48, *s.* 14), upon petition

of any person or corporation, may locate the routes of lines of wire and grant licenses therefor for such a period of time as they deem expedient, may change the terms and conditions of the licenses from time to time, and may revoke the same whenever the public good requires. If a person is damaged in his estate by a license or any act done under it, he may have his damages assessed by the selectmen. Appeals from the decisions of selectmen to the superior court are allowed in certain cases. P. S., c. 81, ss. 2–9. These provisions were designed to regulate and control the use made of highways for such purposes, so that such use will not unduly interfere with the other public uses to which the highways are dedicated. A license under these provisions is not a grant of a franchise, but a mere permission to use highways, subject to limitations and constant control and regulation by public officers. *People* v. *Gas Light Co.*, 38 Mich. 154, 155; *Commercial Electric Co.* v. *Tacoma*, 17 Wash. 661, 672. So far as the operation of the provisions is concerned, it does not matter who the licensee may be for the time being. If a license was granted to the Concord Land and Water Power Company, and the Concord Electric Company, as the vendee of the property, rights, and franchises of that company, is now operating the electric light plant, its use of the highways may be regulated and controlled under these provisions, the same as if there had been no change in the ownership of the plant. If the transfer of the property had the effect to revoke the license, the statute provides a way for obtaining a renewal. P. S., c. 81, s. 18; Laws 1897, c. 92, s. 1.

The statute further provides that " all telegraph, telephone, and electric light companies serving parties for hire shall be deemed to be public, and shall reasonably accommodate persons wishing to enjoy their facilities without discrimination and at reasonable rates." P. S., c. 81, s. 13. In the original act, of which chapter 81 of the Public Statutes is a revision, the corresponding provision relating to electric light companies reads as follows: The " proprietors of any electric lighting apparatus or lines shall furnish the means of lighting by such electric light to all persons within reach thereof and applying therefor upon similar terms and conditions, without discrimination and at reasonable rates." Laws 1881, c. 54, s. 12. The words " electric light companies " in the revised section were evidently intended to describe the same parties as the words " proprietors of any electric lighting apparatus or lines " in the original section, and to include natural persons as well as corporations. This provision imposes certain duties in behalf of the public upon the corporation or natural person engaged in the business of furnishing electric lights for hire and making use of highways in the business. By virtue of it, and also

in consideration of the license to make use of highways, the corporation or natural person assumes an obligation to the state to carry on the business faithfully and impartially so far as the public are concerned. While the obligation is personal so long as the corporation or person holds the property used in its performance, it passes with the property to a vendee and must be assumed by the latter. The Concord Electric Company is under the same obligation to furnish electric lighting facilities to the public at reasonable rates and without discrimination as was the Concord Land and Water Power Company. It succeeded that company in the business and the ownership of the plant, and the statute now applies to it the same as it formerly did to the Water Power Company. The state relies for a fulfilment of the public purposes in view, not upon its confidence in particular persons, but upon statutory provisions defining the duties of persons engaged in the business and regulating their conduct. Although a corporation or a person becomes incapacitated for performing the public duties pertaining to the business by disposing of the property and franchises used in it, the public purposes are not thereby defeated. All the public duties and obligations pertaining to the business follow the property and franchises into the possession of whomsoever they go, and attach to their owners for the time being. Under these circumstances public policy does not require that such corporations should be disabled from alienating their property and franchises.

But there is another consideration that seems conclusive. A natural person may engage in the business of furnishing electric lights for hire, and acquire all the privileges and be subject to all the duties and obligations pertaining to the business as provided in the statute. There can be no doubt that a person so engaged is at liberty to dispose of his business and property at pleasure. The fact that the legislature have placed a corporation engaged in the business of electric lighting upon the same footing in all respects as a natural person, shows that they understood and intended that a corporation of this kind should have equal freedom as to the disposition of its property and rights.

It is not difficult to see why the legislature adopted this course. A policy that would deprive an electric light corporation of the power of selling out its business and property when it becomes financially embarrassed, or of raising money to carry on the business by a pledge of its property and franchises, would tend to defeat the fulfilment of its public purposes. A corporation so hampered might be worse than useless to its stockholders and the public. It might not be able either to use its property and franchises, or to transfer them to others for use. "It is said, if the corporation is permitted to dispose of its franchises and of its prop-

erty essential to their exercise, it will disable itself from performing its obligations to the public. It might seem to be an answer in point that unless it is permitted so to do it will never have any ability to perform those obligations." *Miller* v. *Railroad,* 36 Vt. 452, 491. Nor is it apparent how unsecured creditors of a corporation could avail themselves of the property and franchises to pay their debts. The policy that would disable the corporation from pledging its property and franchises for its indebtedness would prevent them from being taken by judgment creditors upon a levy. 4 Thomp. Corp., *s.* 5364 ; 6 *Ib., s.* 7853. All the supposed evils attending the substitution of another person or corporation for the original corporation would arise if the property and franchises were transferred by a levy, the same as if they were transferred by the foreclosure of a mortgage or by a sale. For example, how would the public be any better off by a transfer of the Bridge-street station and its apparatus (property that is indispensable to the business) to the General Electric Company by a levy, than it would be by a transfer to other persons upon a foreclosure of the mortgage to the American Loan and Trust Company? The right to sell or pledge property is one of the principal rights pertaining to ownership, and one that is generally essential to enable the owner to use the property in business enterprises successfully. The policy adopted by the state, so far as electric light corporations are concerned, allows this right to remain unimpaired, and secures the assurance that corporations will fulfill their public duties by providing for a regulation of their use of the property. It regards mortgages of the property and franchises of such corporations, made to secure debts incurred in their authorized business, as contracts or conveyances "necessary and proper for the transaction of their authorized business," as well as necessary and proper for the fulfilment of their obligations to the public.

There are general laws which expressly authorize railroad corporations and street railway corporations to incur debts and secure their payment by mortgages of their property and franchises. Laws 1897, *c.* 71, *s.* 1 ; Laws 1895, *c.* 27, *ss.* 16, 17 ; Laws 1897, *c.* 74, *s.* 1. During the past ten years fourteen electric light companies have been incorporated in this state by special charters, and each of them was expressly authorized to mortgage its property and franchises. Laws 1893, *cc.* 201, 227, 273, 303 ; Laws 1897, *cc.* 144, 172, 173, 184, 202, 203, 206 ; Laws 1899, *cc.* 208, 218 ; Laws 1901, *c.* 243. Five acts have been passed authorizing the consolidation of electric light companies, each of which expressly gave the consolidated corporation like authority. Laws 1897, *c.* 137 ; Laws 1899, *c.* 164 ; Laws 1901, *cc.* 189, 195, 276. The charters of three corporations previously granted have been amended by

introducing into them authority of this kind.    Laws 1893, cc. 177, 193, 301.    It is said by the defendants upon their brief that of ninety-eight special charters granted by the legislature since 1887, to gas, electric light, electric railway, water, aqueduct, telephone, and telegraph companies, eighty have contained authority to mortgage the corporation's property, or property and franchises.    This legislation all tends very strongly to prove the existence of a public policy in this state which allows *quasi*-public corporations — even railroad corporations — the same freedom to incur debts and pledge their property and franchises therefor that is possessed by other corporations and by natural persons.    Whatever the public policy may be in respect to other corporations, no doubt is entertained that it allows electric light and power corporations, formed under the general law and making use of public highways for stringing wires under licenses granted by selectmen, to alienate or mortgage their property and secondary franchises.    Accordingly it is held that the Concord Electric Company has power to mortgage its property and franchises.    In other states similar views have been taken under similar conditions.    *Detroit* v. *Gas Co.*, 43 Mich. 594; *Hunt* v. *Gaslight Co.*, 95 Tenn. 136; *Hays* v. *Gas Light Co.*, 29 Ohio St. 330; *Evans* v. *Heating Co.*, 157 Mass. 37.

*Case discharged.*

All concurred.